UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| UNITED STATES OF AMERICA | No. 16 CR 287 |
|---|---|
| v. | Judge Manish S. Shah |
| RUBEN ANTONIO OCHOA CRUZ | |

**MEMORANDUM OPINION AND ORDER**

ATF Agents questioned Ruben Antonio Ochoa Cruz, a 20-year-old native Spanish speaker from Puerto Rico, about a fire that destroyed a furniture warehouse. Ochoa worked at the warehouse in Woodridge, Illinois, and during the interview, admitted that he lit a piece of paper on fire inside the warehouse shortly before the conflagration. Ochoa moves to suppress his statements.

No material facts are in dispute, and an evidentiary hearing is unnecessary. In support of his motion, Ochoa relies on the recordings of his interrogation, the ATF's reports of interviews, and related documents. Ochoa did not offer any facts to contradict the content of the recordings and documents, and the dispute here is really over whether the government's evidence demonstrates that Ochoa's statements were voluntary. *See United States v. Sturdivant*, 796 F.3d 690, 695 (7th Cir. 2015); *United States v. Villalpando*, 588 F.3d 1124, 1128–29 (7th Cir. 2009) (burden is on the government to prove the voluntariness of defendant's statements by a preponderance of the evidence). An evidentiary hearing would not assist in resolving that dispute.[1]

---

[1] Ochoa suggests that the interrogators' intent or purpose in conducting the interview in a certain way might shed light on its coerciveness. Their subjective intent, however, does not

Ochoa agreed to speak to the investigators on April 28, 2016, a week after the fire and a few days after he gave an initial statement to law enforcement personnel. He met the agents at the site of the warehouse and then agreed, at the agents' request, to go to ATF's offices. ATF Special Agent James Grady and Woodridge Police Officer Joe Saenz conducted most of the questioning. Saenz spoke Spanish, and primarily served as an interpreter-translator, although he had difficulty understanding Ochoa's Puerto Rican Spanish. Ochoa spoke in both Spanish and English, and the agents encouraged him to speak in English. Grady, with Saenz's assistance, administered a polygraph test on Ochoa. After the polygraph, Grady confronted Ochoa with the fact that he failed the test, and urged him to tell the truth. Ochoa admitted that he started a fire in the warehouse, and later, ATF Special Agent Jeff Marshall questioned Ochoa, with Saenz again assisting in Spanish.

Ochoa argues that his statements should be suppressed because they were coerced by a combination of circumstances. He was a native Spanish speaker

---

change what they communicated—in words or deeds—to Ochoa, and Ochoa offers no facts to suggest that a silent intent on the part of the questioner contributed to his own sense of free will. "And, in any event, the investigator's purpose or subjective view of the coercive nature of the interrogation is not relevant. It is how those interrogation techniques interact with the defendant's characteristics that determines the voluntariness of a confession." *Dassey v. Dittmann*, No. 16-3397, 2017 WL 2683893, at *18 (7th Cir. June 22, 2017). The Spanish-speaking officer's facility (or lack thereof) with Puerto Rican Spanish is apparent from the recordings, and exploring that officer's training and experience would not shed light on what he actually communicated to Ochoa, which is memorialized in the uncontested recordings. Finally, the falsity of the agents' representations to Ochoa, and their materiality, can be assessed on the current record. Whether the agents subjectively knew their statements were false is immaterial to a determination of what they said and how they said it, and without any factual proffer (beyond the recordings themselves) of how the statements influenced Ochoa's exercise of free will, an evidentiary hearing is unnecessary.

2

answering questions without the benefit of a neutral, verbatim translator, and was under pressure to speak in English. He argues that the agents made false promises of leniency, and that Ochoa had little experience with the criminal justice system. His insomnia prevented him from sleeping much the night before the interview. I agree that the interview could have been conducted differently, but in the end, Ochoa's free will was not overcome. The totality of the circumstances demonstrates that Ochoa's statements were a product of his own rational intellect. *See Villalpando*, 588 F.3d at 1128 (quoting *United States v. Dillon*, 150 F.3d 754, 757 (7th Cir. 1998)).

The interviews were not a model of clarity.[2] At times, all three participants (Grady, Saenz, and Ochoa) talked over each other; there were miscommunications; and there were occasions when Grady and Saenz misunderstood what Ochoa was saying. Saenz repeatedly had trouble understanding Ochoa's Spanish. There were instances when Ochoa made a statement in Spanish that Saenz did not translate for Grady. But Ochoa's overall comprehension was quite good. He responded to some questions in English (even questions that were posed in Spanish),[3] asked for clarification when he did not understand something, offered context-appropriate

---

[2] The interviews were recorded in four audio files, labeled Grady 1, Polygraph, Grady 2, and Marshall. There may be unrecorded interactions between Ochoa and the agents, but he does not argue or proffer that something coercive happened during such unrecorded moments. From the beginning of the recording (in Grady 1), until Ochoa makes his first incriminating statement (in Polygraph), there is no indication that anything of consequence occurred with Ochoa that was unrecorded. The parties submitted draft transcripts of the recordings that included English translations of the Spanish statements.

[3] *E.g.*, Polygraph at 1:05:43–1:06:10.

3

responses, and was able to read English text.[4] Ochoa's demeanor in the recordings indicates that he is bright. He answered many questions quickly, demonstrating good cognitive abilities, and showed that he could discern the import of his circumstances.[5] Indeed, based on my review of the recordings, I find that Ochoa was the least confused—from a language-comprehension point of view—of all the participants.[6]

Saenz's imperfect translation and difficulty understanding Ochoa's Spanish did not prevent Ochoa from exercising free will. Ochoa did not have any significant difficulty understanding Saenz—it was Grady's English that Ochoa asked to clarify. When Saenz needed Ochoa to slow down, he slowed down. Ochoa knew from his experience with his co-workers that his Puerto Rican Spanish could be difficult to understand, and he could adapt. Grady 1 at 09:00–09:18. Although Ochoa now argues that Saenz's errors prevented him from fully understanding what was communicated, the recording does not support that argument. Miscommunications

---

[4] At the beginning of the interview, Ochoa tested his own English comprehension by repeating, in Spanish, what Grady said to him in English, and Ochoa was correct. Grady 1 at 03:12–03:40.

[5] For example, after being told that blood pressure was monitored as part of the polygraph test and was used to tell if someone is lying, Ochoa told the agents that his blood pressure goes up and his ears turn red when he is agitated. Polygraph at 13:31–15:45. Later, as another example of his situational awareness, after admitting that he set a piece of paper on fire, Ochoa promptly said, "I'm going to jail, right?" Polygraph at 1:24:24–1:24:30.

[6] A good example of this is the exchange in Polygraph at 1:09:50–1:11:26, where Ochoa was doggedly pressing his point to try to convey his information. Ochoa chuckled in a manner that, even if the product of nervousness, shows that he chose his words carefully and rationally.

were clarified, and most importantly with respect to voluntariness and free will, Ochoa (reading from a preprinted form) said that he understood that he could stop the interview at any time. Grady 1 at 1:07:18–1:07:25; *see also id.* at 1:07:26–1:07:52 (Saenz (in Spanish): "If you decide that you don't want to continue with the test, we can end it." Ochoa (in Spanish): "Sure." Grady (in English): "Got it?" Ochoa (in English): "Yup."); *id.* at 1:18:50–1:19:15 (Ochoa (in Spanish): "I can ask if I don't understand?" Grady: "Oh absolutely."). In addition, Ochoa does not dispute that he understood his *Miranda* rights when read to him in Spanish. *See* [35] at 4; [40] at 6.

Saenz's lack of neutrality or failure to provide verbatim translation was not coercive. His role as a police officer was not concealed from Ochoa. Saenz said he was there to help both Grady and Ochoa, Grady 1 at 04:43–05:01, but throughout the conversation (and before Ochoa made incriminating statements), it was clear that Saenz was acting at the direction of the lead interrogator, Grady.[7] The absence of verbatim translation was also not concealed, and Ochoa's limited ability to follow in English and correct misapprehensions throughout the interview demonstrated his ability to choose what he wanted to say. As Ochoa acknowledges, [40] at 4, there is no bright-line constitutional requirement for verbatim, neutral translation in an interrogation. *Carrion v. Butler*, 835 F.3d 764, 776 (7th Cir. 2016). But even as a component of the totality of the circumstances, Saenz's role did not undermine

---

[7] There were times when Ochoa gave directions to Saenz. *E.g.*, Grady 1 at 49:49–49:56 (Ochoa (in Spanish to Saenz): "Tell him [Grady], so that he can understand.").

5

Ochoa's free will. The recording speaks for itself, and it provides clear evidence that Ochoa was under no illusions about Saenz, understood his options, and made a choice to speak.

Ochoa argues that the agents' requests that he speak in English placed stress and pressure on him. The recording contains no such indication. Ochoa spoke in English at times, *e.g.*, Grady 1 at 48:14–49:13, and when he struggled—as he did often—he spoke in Spanish without repercussions from the agents, *e.g.*, Grady 1 at 16:20–17:11. In context, the requests to speak in English were not coercive because Ochoa clearly understood that he could speak in Spanish at any time.

When advising Ochoa of his *Miranda* rights, Grady told Ochoa that he was not under arrest and he was not in trouble. Grady 1 at 1:01:33–1:01:38. He also told him that by taking the polygraph, Ochoa was helping the investigation. Grady 1 at 1:00:35–1:00:52. Later, after telling Ochoa that he failed the polygraph, Grady and Saenz suggested to Ochoa that he started a small fire, did not intend for it to get big, and that it was the firefighters' fault that the fire went out of control. Polygraph at 1:14:30–1:15:07. Grady told Ochoa that the gigantic fire was not his fault, but that in order for Grady and Saenz to defend and help Ochoa, Ochoa should admit that he started a small fire because he was angry at his employer. Polygraph at 1:17:12–1:17:49. Ochoa immediately denied that that was his motivation, and said he did not do anything. *Id.* A few moments later, after the agents said that they believed that Ochoa did not intend to make a big fire, Ochoa asked, "what happens?" *Id.* at

6

1:18:20–1:18:36. He asked that question a few times; he was asking what would happen to him if he made that admission. *Id.* at 1:18:36–1:18:55. He was carefully assessing whether to make an admission, and attempting to extract information from the agents before making such a consequential decision. Grady did not answer the question, and instead, said that he needed Ochoa to tell the truth so Grady could defend him. *Id.* at 1:18:54–1:19:27.

Grady again told Ochoa that the big fire was not on him. Ochoa said, in English, that he could not "go to jail for nothing," and Grady said, "We're not talking about jail." *Id.* at 1:19:43–1:19:50. Ochoa then indicated, in English, that he understood what Grady was trying to do. *Id.* at 1:20:00–1:20:07. To which Grady replied, "You need to let us help you." *Id.* Ochoa continued to deny that he was motivated by anger, and the agents continued to press their theory of motive while placing responsibility on the firefighters. *Id.* at 1:20:15–1:22:10. This exchange culminated with Grady telling Ochoa to "own up and be a man." *Id.* at 1:22:20–1:22:28. Ochoa then admitted that he set a piece of paper on fire. *Id.* at 1:22:36–1:23:29. Grady returned to motive, and Ochoa again pushed back by saying, "forget about it, I don't know." *Id.* at 1:24:07–1:24:16. Ochoa, at that point, was focused on the consequences of his admission, and said, "I'm going to jail, right?" *Id.* at 1:24:24–1:24:30. As he put it, "I fucked my life, man," and he understood he faced "time in jail." *Id.* at 1:24:52–1:25:01.

I have no doubt that at this point in the interrogation, Ochoa was feeling pressure. He had been hooked up to a polygraph (anyone who has been hooked up to one will say that that alone is nerve-wracking), was told he failed the test, and then was told that the agents could help and defend him if he made an admission. The question is whether the agents' conduct caused Ochoa to make an irrational decision, one that undermines the reliability of his statements. *See Villalpando*, 588 F.3d at 1128 ("Police conduct that influences a rational person who is innocent to view a false confession as more beneficial than being honest is necessarily coercive, because of the way it realigns a suspect's incentives during interrogation."). As a general matter, cajoling or deceit by agents is not coercive unless a materially false promise skewed a suspect's ability to exercise free will. *Id*. Grady's statement that the big fire was not Ochoa's fault was false (assuming that Ochoa's small fire was, in fact, the proximate cause of the large one, and no action by the firefighters broke the chain of causation). But there was no materially false promise of leniency here. Grady did not promise there would be no consequences, and in fact, Ochoa clearly realized that the agents were being ambiguous about the consequences—he asked about them, and the agents dodged the question. Saying that they wanted to help or defend Ochoa was not a promise of leniency by agents, but was a legitimate, non-coercive way to urge truthfulness and cooperation. The most worrisome moment was when Grady said, "We're not talking about jail." I conclude that Grady was not making a promise in that statement—he was deflecting Ochoa's concerns. More importantly, Ochoa did

8

not believe that Grady was making a promise. *Cf. Dassey v. Dittmann*, No. 16-3397, 2017 WL 2683893, *18 (7th Cir. June 22, 2017) (to determine coerciveness, a court cannot consider the promise alone, but rather the promise in conjunction with the characteristics of the suspect). Instead, Ochoa understood that Grady was avoiding the issue. Ochoa himself believed he would go to jail if he admitted setting the fire, and Grady's statement did not disabuse him of that notion. *See* Marshall at 02:38–02:48 (Ochoa: "I think I'm going to go to prison.").

The tone of the conversation is important. There was no yelling, no threats, and no physical abuse. Neither the duration of the questioning (over four hours) nor the fact that Ochoa had minimal prior contact with the criminal justice system tips the scales here, in light of the calm, measured manner of questioning. Ochoa's statements reveal his ability to assess the situation and make a rational choice. Ochoa's insomnia did not compromise his cognitive abilities. He explained that he has always suffered from it, that it was not unusual for him, and he added that his sleeplessness was in part due to sleeping on an uncomfortable couch. Polygraph at 17:57–18:21. Nothing in Ochoa's demeanor or answers throughout the interview indicated irrationality or involuntariness.

In addition to their tone, the agents did several other things to avoid coercion. They repeatedly offered Ochoa food, water, and breaks. They told him he could stop the interview. They gave him his *Miranda* rights. *See McNary v. Lemke*, 708 F.3d 905, 918 (7th Cir. 2013) (*Miranda* warnings mitigate coercive atmosphere) (quoting

9

*Illinois v. Perkins*, 496 U.S. 292, 296 (1990)); *see also Berkemer v. McCarty*, 468 U.S. 420, 433 n.20 (1984) (cases of post-*Miranda* compulsion are rare). Ochoa had his cell phone and was not, in that sense, cut off from the outside world. *See* Grady 2 at 00:38–00:56 (Ochoa receiving an alert on his phone); *see also* Grady 2 at 04:04–04:35 (taking away Ochoa's phone before leaving him alone in a room). In the end, he acknowledged that he had been treated respectfully. Marshall at 03:50–04:05.

Ochoa was young—20 years old—but the picture that develops from the totality of the circumstances is that he exercised his own free will when choosing to make incriminating statements.[8] Indeed, Ochoa's own brief characterizes his repeated denials that he intended to cause damage as "steadfast." [35] at 5. I agree. Ochoa was firm and unwavering on several points, including his refusal to adopt the agents' description of his supposed motive. *See* Polygraph at 1:15:20–1:15:36. The agents could have been clearer, and the interpretation and translation could have been more precise, but Ochoa's free will was not overcome.

---

[8] Ochoa was not a juvenile, and offers no evidence to indicate any particular suggestibility or a lack of intelligence. Nevertheless, I have considered language comprehension, age, and insomnia when looking "at the interplay between the characteristics of the defendant and the nature of the interrogation." *Dassey*, 2017 WL 2683893, at *14. Ochoa was fully aware of the investigators' interests and their questions, he pushed back (and never acceded) on the question of motive, and he made a rational choice to make his admissions.

Defendant's motion to suppress, [35], is denied.

ENTER:

Date: June 27, 2017

　　　　　　　　　　/s/ Manish S. Shah　　　　　　
Manish S. Shah
United States District Judge